

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00384-CV

| | | |
|---|---|---|
| In the Interest of K.R.G., A Child | § | From the 271st District Court |
| | § | of Wise County (CV10-07-592) |
| | § | March 21, 2013 |
| | § | Opinion by Justice McCoy |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS


By_____
Justice Bob McCoy



## COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00384-CV

IN THE INTEREST OF K.R.G., A CHILD

------------

FROM THE 271ST DISTRICT COURT OF WISE COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

Appellants Mother and Father separately appeal the termination of their parental rights to K.R.G. We affirm.

## II. Procedural Background

K.R.G. was born on November 11, 2005, and her brother A.G. was born on July 4, 2010. The Department of Family and Protective Services (DFPS) filed its

---

[1]*See* Tex. R. App. P. 47.4.

original petition in this case on July 29, 2010, with regard to both K.R.G. and A.G., listing Mother and Father as the children's parents. A few weeks later, however, DFPS filed a first amended petition pertaining only to K.R.G., and it filed a separate original petition pertaining to A.G. in trial court cause number CV10-08-627.[2]

Following a hearing on August 18, 2010, the trial court ordered DFPS to conduct a home study on "Debra Roberts" (Mother's mother) and "Tina Rogers" (Father's sister)[3] and ordered Mother and Father to perform the following: (1) submit to and cooperate fully in the preparation of a court-ordered psychological or psychiatric evaluation and follow all recommendations outlined in the evaluation; (2) attend counseling sessions to address the specific issues that led to K.R.G.'s removal and any additional issues arising from the psychological examinations or counseling sessions; (3) participate in and successfully complete parenting classes; (4) submit and cooperate fully in the preparation of a court-ordered drug and alcohol dependency assessment, actively participate in any drug treatment program, and follow through with any treatment plan recommended by the drug and alcohol dependency assessment;

---

[2]We previously consolidated this appeal with cause number 02-12-00400-CV, involving A.G., but we severed that appeal and dismissed it for want of jurisdiction because the order terminating Mother's and Father's parental rights in that case remained interlocutory. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001).

[3]We use pseudonyms for the children's caregivers and family members to protect the children's identities. *See* Tex. R. App. P. 9.8 & cmt.

and (5) submit to random drug tests at DFPS's request and submit urine, hair, or blood samples within four hours of any such request by DFPS. The trial court also ordered Mother and Father "to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of th[e] suit." Mother and Father both signed the order.

At the January 26, 2011 permanency hearing, the trial court found that both parents had shown "adequate and appropriate compliance with the service plan," but not to the extent that K.R.G. could be returned to them at that time. The trial court left K.R.G. with "Micah Roberts" (Mother's father) after Debra died.[4] The trial court also ordered both parents to submit immediately to hair follicle drug exams.

At the August 24, 2011 permanency hearing, the trial court again noted that both parents had "demonstrated some adequate and appropriate compliance with the service plan" but that neither parent was willing and able to provide K.R.G. with a safe environment such that her current placement—foster care, after K.R.G.'s (and A.G.'s) removal from Micah in May or June—remained the most appropriate for K.R.G.'s needs. The trial court made the same finding about K.R.G.'s parents at the November 23, 2011 permanency hearing, and ordered the parents to submit to hair follicle drug tests by December 7, 2011.

---

[4]A.G. remained placed with K.R.G. in Micah's home.

K.R.G.'s case was tried with A.G.'s case before an associate judge in June 2012, and the associate judge entered orders of termination of Mother's and Father's parental rights to K.R.G. in August 2012. In the order, the associate judge found by clear and convincing evidence that Mother and Father had "[e]ngaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of" K.R.G. and that termination of the parent-child relationship between each parent and K.R.G. was in K.R.G.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(E), (2) (West Supp. 2012).

Mother and Father filed separate requests for a de novo hearing and for findings of fact and conclusions of law. On September 26, 2012, the associate judge filed findings of fact and conclusions of law, which the presiding judge adopted, finding that Mother and Father had both, by clear and convincing evidence, engaged in endangering conduct or knowingly placed K.R.G. with persons who engaged in such conduct; that termination of both parents' rights to K.R.G. was in the child's best interest; and that appointment of DFPS as the child's managing conservator was in the child's best interest. It also noted that one of Father's relatives "was afforded a reasonable opportunity to request appointment" as the child's managing conservator.[5]

---

[5]The record reflects that the relative of Father's mentioned in the findings was most likely his sister Tina. However, because neither Mother nor Father argues that K.R.G. should have been placed with Tina, we will not address the

The associate judge and presiding judge signed an amended order of termination and findings of fact and conclusions of law with regard to K.R.G.—setting out essentially the same information—on September 26, 2012. After the presiding judge signed an order affirming the associate judge's termination order, these appeals followed.

### III. Termination of Parental Rights

Mother and Father both argue that the trial court improperly admitted their hair follicle drug test results and that there is legally and factually insufficient evidence to support the trial court's endangerment or best interest findings.[6]

### A. Standards of Review

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of

---

portions of the record pertaining to her in as much detail as the rest of our evidentiary recitation below.

[6]In his first issue, Father also argues that the trial court erred by proceeding to trial without the inclusion of A.G.'s putative father, P.A.P., "effectively den[ying] [P.A.P.] the chance to establish his paternity over the child." However, because we have severed the appeal that pertains to A.G. in cause number 02-12-00400-CV, and no one argues that P.A.P. has any relation to K.R.G., we need not reach this issue. *See* Tex. R. App. P. 47.1.

6

fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.206(a) (West 2008); *see also id.* § 161.001. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Therefore, in evaluating the evidence for legal sufficiency, we must determine in each appeal here whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the endangerment ground in section 161.001(1)(E) and that best interest under section 161.001(2) was proven. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To do so, we review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574.

And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that Mother and Father each violated section 161.001(1)(E) and that termination of their parent-child relationships would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

We will review Mother and Father's hearsay challenges within the context of their sufficiency challenges, noting that even when clear and convincing evidence justifies termination, the judgment may nevertheless be reversed upon a showing that admission of evidence was reversible error under rule of appellate procedure 44.1. *See* Tex. R. App. P. 44.1 (stating that no judgment may be reversed on appeal on the ground that the trial court made an error of law unless the error complained of probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case to the court of appeals); *Tex. Dep't of Human Servs. v. White*, 817 S.W.2d 62, 63 (Tex.

8

1991).  However, we review a trial court's evidentiary rulings for an abuse of discretion, and an erroneous admission of evidence is harmless if it is merely cumulative.  *In re C.R.,* 263 S.W.3d 368, 370–71 (Tex. App.—Dallas 2008, no pet.).

## B. Endangerment Evidence

### 1.  2007 CPS Case

No one at trial disputed that in 2007, Tarrant County Child Protective Services (CPS) removed eighteen-month-old K.R.G. from Mother and Father because they had been using methamphetamine.[7]

#### a.  Methamphetamine Use

Karon Taylor, Mother and Father's Tarrant County CPS caseworker from March 2007 to January 2008, testified that CPS became involved with the family because someone had reported that both parents were using methamphetamine and that their house was cluttered and dirty, constituting a hazard to K.R.G.

Father admitted that he and Mother had used methamphetamine together while K.R.G. "was in her room on the other side of the house" and that prior to K.R.G.'s removal, they had been using drugs "the whole time [K.R.G.] was in the

---

[7]During the 2007 CPS case, Mother married P.A.P. but then returned to Father.  Mother testified that Father was the biological father of both K.R.G. and A.G. and that he had signed both children's birth certificates.  Mother said her last contact with P.A.P. was in 2008 and that he had been redeployed to Afghanistan after they married.

9

house."[8]  Mother also agreed that she and Father had used methamphetamine in the home, and she pointed out that when they used it in the home, "it was in [their] own personal bedroom, after [K.R.G.] was asleep at night."  Mother said that she never used drugs without Father and that, to her knowledge, he never used them without her, so they "mostly" used the drugs in the evenings, since Father worked.

Taylor stated that Mother and Father had never admitted to her that they used illegal drugs; with regard to the drug use allegations, they instead told her that their use of Sudafed "creat[ed] the positive . . . drug test for both methamphetamine and amphetamine."

### b.  Mother and Father's Home

Taylor testified that when CPS opened the case, Mother and Father's home "was dirty and very cluttered with dog feces on the floor, scattered newspapers, and it was just a—a cluttered environment" that she believed was unsafe.

### c.  CPS Service Plan

Father had difficulty recalling the 2007 case or any of the services he had been ordered to perform, but he acknowledged signing the participation orders, which the trial court admitted as Petitioner's Exhibits 1, 2, and 3 "strictly for the

---

[8]Father denied that he had been selling drugs at the time but he admitted that he and Mother never paid for the drugs they used.  He claimed that the drugs were given to them.

purpose of the fact that they exist; not for the content of [them]."[9] Mother recalled that they had been asked to attend parenting and drug treatment classes and to remain in contact with DFPS. Mother acknowledged that she and Father did not complete their drug treatment classes during the 2007 case.

Taylor said that her service plan for Mother and Father had included drug assessment, drug treatment, parenting classes, and random drug testing and that when Mother and Father failed to comply, DFPS petitioned for court-ordered services, which the trial court then ordered. CPS placed K.R.G. with Mother's mother Debra.[10] Taylor said that the case was closed in January 2008 when the parents agreed to leave K.R.G. with Debra until they could present certificates of completion and satisfactory participation in the parenting classes and drug treatment.[11] Wise County CPS investigator Amelia Torres testified that neither

---

[9]Petitioner's Exhibit 1 is the July 5, 2007 order for Mother and Father to place K.R.G. with Debra and for Mother and Father to participate in CPS services. Petitioner's Exhibit 2 is the September 20, 2007 participation review hearing order, and Petitioner's Exhibit 3 is the November 8, 2007 participation review hearing order.

[10]Taylor testified that Debra's house was clean, that K.R.G. had a separate bedroom and toys, that no safety hazards were present to create a dangerous environment, and that Debra had agreed that K.R.G. could stay for as long as it was necessary. Debra supervised visits between Mother and Father and K.R.G. until Father indicated that he was having difficulty with Debra and began having his supervised visits at the CPS office. At the time CPS placed K.R.G. with Debra, Debra was living with someone other than Mother's father Micah; Mother complained that this made it difficult to schedule visits. By the time Mother became pregnant with A.G., Debra and Micah had resumed living together.

[11]Father testified that Debra told him and Mother that they could not have K.R.G. back but that he did not take any action to try to have K.R.G. returned to

11

parent had completed the services in the 2007 case necessary for K.R.G.'s return to them by the time she investigated after A.G.'s birth in July 2010.

At some point, Father pleaded guilty to a charge of unlawful use of a motor vehicle in exchange for deferred adjudication community supervision. At the time of the 2012 termination trial, he was incarcerated and waiting to see if, in the month following the termination trial, the trial court would reinstate or revoke his deferred adjudication community supervision for failing to appear at a "probation administrative hearing"; if revoked, he would start serving twelve months' confinement in state jail in the month after the termination trial. Father denied that his community supervision was being revoked for having had a positive drug test.

### 2. 2010 CPS Case

Father and Mother were living together in Wise County when Mother became pregnant with A.G. Torres stated that the July 2010 neglectful supervision allegation against Mother regarding A.G. after his premature birth was found "reason to believe" because CPS "found that the mother was using illegal drugs during her pregnancy."[12] Torres said that Mother denied any drug use and told Torres that her drug test was positive because she had taken

_____

them. Mother said that they were given the impression that K.R.G. had to stay with Debra and that if they tried to remove K.R.G., Debra was to call the authorities, and all of them—including Debra—would be arrested.

[12]After A.G. was born two months prematurely, in July 2010, Mother remained hospitalized for two or three weeks.

12

Sudafed.[13]  Torres stated that when she talked with Father, he also denied using drugs but "admit[ted] to pot smoking[,] and he asked if pot could cause the drug test results."  Father also attributed his positive test results to a third person, Sara Smith, who was living in the house with him and Mother during the month A.G. was born and who had used drugs in their presence.

A.G. remained hospitalized for two or three months after his premature birth and then CPS placed him with K.R.G. at Debra's house, where the two children remained until Debra's death.  After Debra died, the children resided with Micah for around four months before being placed into foster care.  CPS removed the children from Micah and placed them into the first of three foster homes after Mother's sister Nora, who had also been living in Micah's house, called Jennifer Ferrugia, the Wise County CPS caseworker, and "let [her] know that her dad had hit her, and that she had fallen on top of the baby, [A.G.], while they were doing a garage sale."[14]  Nora told her that this was not the first time he had hit her.  Ferrugia, accompanied by police and another CPS worker, went to Micah's house and removed the children from him.

---

[13]Torres said that when she asked Mother why K.R.G. had not been returned to her, Mother told her that she knew K.R.G. was better off where she was.  Mother told Torres that the last time she had used illegal drugs was in 2008 but also told Torres that she had been clean since 2007.

[14]Shelby Michaels, K.R.G.'s counselor, stated that K.R.G. told her that she missed her grandfather Micah but that she could not be with him because of an incident in which he hit her aunt and because he would spank and hit her and yell at her.

### a. Methamphetamine Use

Father said that he had used methamphetamine at home while Mother was pregnant with A.G. and while Mother was at home but that he "did not know for a fact," and had not suspected, that Mother had been using it too. Father admitted that he had provided Mother with drugs when they had used them together in the past.

Mother denied using methamphetamine while pregnant with A.G. When confronted with her responses to DFPS's request for admissions, in which she had admitted that she used illegal drugs while pregnant with A.G., Mother stated, "I was around the drugs, but I didn't use the drugs," and said that her earlier admission was untrue.[15]

---

[15]Mother read into the record DFPS's requests for admissions #5, #6, #12, #13, #14, #15, #16, #21, and #25, and her responses to them. Question #5 asked, "Admit that you tested positive for illegal drugs in March of 2011," and Mother's response was "Admit." Question #6 asked, "Admit that you used illegal drugs during the time you were pregnant with [A.G.]," and Mother's response was, "Admit." Question #12 asked, "Admit that you tested positive for illegal drugs in May of 2011," and Mother's response was "Admit." Question #13 asked, "Admit that you used illegal drugs in November of 2011," and Mother's response was, "Deny." Question #14 asked, "Admit that you used illegal drugs in November of 2010," and Mother's response was, "Admit." Question #15 asked, "Admit that you've used illegal drugs since 2007," and Mother's response was, "Admit." Question #16 asked, "Admit that you used illegal drugs with [Father]," and Mother's response was, "Admit." Question #21 asked, "Admit [you] used illegal drugs during [your] CPS visit in 2007," and Mother's response was, "Admit." Question #25 asked, "Admit that [Father] knew you were using drugs during the time you were pregnant with [A.G.]," and Mother's response was, "Admit." Mother said that she was confused when she answered the requests for admissions.

Mother testified that she did not use illegal drugs in July 2010, September 2010, or November 2010 but admitted that she had tested positive for illegal drugs in November 2010, March 2011, May 2011, and November 2011. She stated that her last drug use had probably been in October or November 2009 and that she had managed to stop using drugs on her own. However, she also testified that between the end of the previous CPS case in 2008 and the beginning of the 2010 case, she had used illegal drugs "off and on, but not very often at all," describing her usage as "[o]nce every couple of months."

Father said that he had stopped using drugs after A.G.'s birth and removal, which was in July 2010; however, he also said that he had stopped using drugs in the summer of 2011. Father testified that after he completed a drug assessment in 2011, he was told that he did not need to do drug treatment. Father admitted that he had had more than three positive drug tests during the pendency of the 2010 case, but, as in the 2007 CPS case, he blamed the positive results on taking Sudafed for his allergies. Father testified that he believed Ferrugia when she told him that his drug tests were negative but not when she told him that they were positive "[b]ecause there was no reason for it to be showing positive." Father said that Ferrugia told him that sinus medicine would not show up positive on a drug test but that he did not believe her; he nonetheless continued to take the sinus medication.

Like Father, Mother testified that she had not used illegal drugs since A.G.'s birth but that she had been told that some of her drug tests were positive.

15

Mother also testified that she had explained to Ferrugia that when she tested positive for drugs, it was because she was taking allergy medicine. And like Father, Mother testified that although she did not believe Ferrugia when the caseworker told her that over-the-counter drugs would not cause false positive test results, she continued to take Sudafed for her allergies anyway.

Mother said that she did her first drug assessment in this case on February 2011 and did not receive a treatment recommendation. After her second drug assessment, she received a recommendation for outpatient treatment. Ferrugia went over the recommendations with her, including the one for outpatient treatment. Ferrugia said that Mother seemed to understand the recommendations. However, for her third assessment—which Mother had requested—Mother went to Better Options, where she had completed her anger management classes, even though Ferrugia had explained to her that doing the coursework at Better Options would not satisfy the service plan requirements. Mother insisted on going to Better Options instead of to outpatient drug treatment. Mother told each treatment facility that assessed her that she had not used illegal drugs since 2009.

The trial court admitted Father's drug assessment screening form from Star Council and took judicial notice of everything that had already been filed in the case, which included Mother's Star Council drug assessment screening form. At the February 15, 2011 Star Council intake, Father reported to the intake worker that he had passed all of the drug screens given except for "one

16

inclusive[16] mouth swab with CPS on 09/20/10." At the second intake, which was ordered by CPS and taken on July 14, 2011, the intake worker reported,

> Client states that he failed a hair strand test in February 2011 but has not used any drugs since the end of last year. He was given a drug screen in this office today and the results were negative. He does not qualify for Abuse or Dependence and will be referred back to CPS.

In both screenings, Father self-reported that he did not use drugs.

Mother reported in her February 15, 2011 Star Council intake that she "was given a UA by the hospital on 06/30/10 and was positive for Meth. She reports that she was given a mouth swab by CPS on 09/20/10 and was positive for Methamphetamine. Passed all others since then."[17] At the second, July 14, 2011, intake, the intake worker reported,

> Client answered 'No' to all the Screening questions and states that she has not used any drugs since November 2010. She was given a drug screen in this office today and the results were negative. At this time, client does not qualify for abuse or dependence and will be referred back to CPS.

---

[16]During trial, the parties agreed that the meaning of "inclusive" was "inconclusive."

[17]Mother also reported to the intake worker that she had experienced depression and answered affirmatively to the questions about whether she had ever thought of harming herself or killing herself or ever attempted to harm or kill herself. The intake worker reported that Mother said that "[w]hen she was 14 she over dosed [sic] on prescription medication and a friend of hers found her unconscious and was taken to the ER. No attempts since then." Mother replied, "Yes," to the question of whether she had used alcohol or drugs in the last thirty days, and indicated that she had used alcohol.

Eric Werne, a certified licensed chemical dependence counselor at Better Options, testified that he received a CPS referral for Father for substance abuse counseling. The trial court admitted Father's Exhibit 4, the "Addiction Severity Index Narrative Report" completed by Werne on October 26, 2011, based on Father's self-reported information, and Father's Exhibit 5, a letter from Werne to Ferrugia.

In the October 26, 2011 Better Options intake, Father reported that he had lived at his current address, which neither he nor any of his family owned, for approximately three months. Father reported a history of using only methamphetamine and alcohol. Werne reported,

> Client claims to have been clean and sober since March, 2011. He said he was tired of trying to stay out of trouble, so he quit. He reports to have had no use since this decision. He has had no positive drug screens through probation or CPS since this time. Counselor has no reason to believe the client misrepresented himself.

Father also reported to Werne that he was married and had been living with his wife for around ten years and that he was employed; Werne noted that Father appeared to have a viable income.

Werne recommended that Father do the Better Options twelve-week outpatient counseling services. Werne said that he met with Father for twelve sessions over twelve weeks and that Father completed all of his sessions, some of which Mother also attended. Werne said, "It's hard to determine if they—if

18

they really got anything out of it. I mean, I didn't have any problems with [Father]. He seemed very defiant."

Werne also performed a drug and alcohol assessment on Mother and referred her to the same twelve-week program, which she successfully completed. Werne acknowledged that he did not do any drug testing in his program, so he had no way of knowing—other than his clients' self-reporting—whether they were "clean" or "dirty." He also acknowledged, as a former addict himself, that drug addicts would "say anything to get themselves out of trouble." When asked about the percentage of people who could become and stay sober after methamphetamine use without going through a treatment program, Werne replied that it would be "pretty low," and that those who have used methamphetamine need some type of support system.

Father's Exhibit 5 contained the following undated letter that Werne wrote to Ferrugia, which Ferrugia testified she had received sometime after October 2011:

> In regards to our phone discussion yesterday, I have reevaluated the assessment completed for [Mother] and [Father].
>
> It appears that [Father] and [Mother] were not completely accurate. Both clients reported that they had not used any drugs since March of this year. According to your knowledge, [Father] had a hair strand around two months after his last use, which showed large amounts of methamphetamines. You said you checked with the lab regarding this, and the levels of methamphetamines were as high as someone who was using, and using a lot. Both clients admitted to using methamphetamines over the period of a year, and you let me know that you have worked with this family since 2007, and methamphetamines has been an issue with them all along.

19

Another area of discrepancy has to do with their marital status. According to them, they are common law married. You alerted me yesterday that they are, in fact, not married, as [Mother] is married to another man.

These issues would not change my recommendations, with the exception of addressing their minimization and/or denial of their issues.

When asked whether she thought her drug use had ever put the children in danger, Mother replied, "Absolutely not." Mother then explained that she and Father never used around K.R.G. or in front of her, even though K.R.G. may have been home when they used drugs, stating, "We always made sure [K.R.G.] was in a safe, secure, you know, sleep location before we ever did anything like that." Mother said that she had never been given specific details on "how anything that we've done has put the child in danger, or how she could have been in danger." When asked whether she thought that methamphetamine use by a parent could put his or her children in danger, Mother replied, "I really don't have an opinion on that." Mother said that she had never really thought about whether it might be harmful to her children for her to use drugs. Mother said she would not leave her children with someone who used methamphetamine not because of drug use but because she would not leave her children with anyone other than her family members.

### b. K.R.G.'s Special Needs

Mother testified that K.R.G. had had no behavioral or developmental problems before her removal.

20

Shelby Michaels, a licensed professional counselor and advanced certified drug and alcohol prevention specialist, testified that she had provided therapy to K.R.G. in June 2011, around six months after Debra died and after K.R.G. had been removed from Micah and placed into her first foster home. Michaels noted developmental delays when she first started working with K.R.G.; specifically, she noticed an educational developmental delay and the need for speech therapy. When she began therapy, it was hard for K.R.G., who was around age five, to manipulate puzzle pieces that a three-year-old should have been able to put together, and she did not know the alphabet or colors.

Michaels testified,

> When I first met [K.R.G.], she had extreme problems with emotional angulation. And, obviously, the rules, following directions, setting physical boundaries. She was highly emotional. Fine, and then a very happy moment; and very sad the next.

> She had no idea about rules, boundaries, or anything. She had no rules or limitations. She was very easily agitated and irritated during our first couple of sessions.

Michaels said that K.R.G.'s temper tantrums and other behaviors were not typical five-year-old behaviors. Specifically, when K.R.G. would go into a rage, she would bang her head, scratch herself, hit A.G., hit the dog, and jump off her bed "to the point where the foster parents had to remove the bed frame, and just set the mattress in the room to keep her from hurting herself."

During her therapy with Michaels, K.R.G.'s behavior drastically improved, although Michaels said that K.R.G. "still had a long way to go, but she no longer

21

needed twice a week therapy for her anger, so that was definitely an improvement." Michaels worked with K.R.G. for over six months and said that during that time period, K.R.G.'s diagnosis changed from adjustment disorder to "reactive attachment disorders, marked disturbed." She stated that K.R.G. "was very hateful and mean to strangers, very active and hostile towards caregivers," and that K.R.G. continued to have problems relating and emotionally attaching to significant people in her life.

When asked whether K.R.G. could have been affected by her parents' alleged drug use during the first eighteen months of her life, Michaels said that K.R.G. could have been affected through developmental ways, from lack of parenting skills and role modeling to "major implications on her social skills, and her ability to relate socially and to relate to others." Specifically, she stated that based on her training in dealing with both drug and alcohol users,

> they cannot be emotionally there for their child. Most visibly, they're not there for their child. . . .
>
> Meth, in particular, is going to stay in their system and have day—days of effects, where you may be functioning, but you're not pleasant and in the moment.
>
> So they may not have been able to accurately identify her needs at the time. And she's crying, is it because she was wet and needed changed? Was she hungry? Was she lonely? Did she need to be held and rocked?
>
> Then especially under crystal meth and the physical sensations that it gives, I—I can only form from research that holding a child when you're having your own physical reaction to a drug in your system, could be too much for their system.

22

And if she wasn't held enough, if she wasn't rocked and cared for, then you're going to have that have a lot to do with bonding, you know, how you take care of a child.

Michaels said that even occasional drug use could result in the child being inadequately taken care of during the times of occasional use, and not meeting the child's physical, emotional, and social needs.

When Michaels saw K.R.G. before visits with her parents, K.R.G. "was normally upbeat, cheerful, and happy; ready to engage in a session," but when she saw her after visits with Mother and Father, K.R.G. would behave inappropriately, including making prejudicial racial remarks, yelling, screaming, and refusing to follow any therapy rules. Michaels said that there were times when K.R.G. would have uncontrollable crying fits and that K.R.G. once threw a pair of shoes at her after a visit with her parents. When visits with Mother and Father were cancelled, K.R.G. would become sad and withdrawn and would not engage in her therapy session.

Michaels observed two visits between K.R.G. and her parents. The first visit was at the foster home. K.R.G. played by herself, while her parents sat at the table sending text messages, talking among themselves, and occasionally feeding A.G.

K.R.G. made an outcry of sexual abuse during the first visit that Michaels observed. Michaels said that K.R.G. had originally made the outcry to her foster mother and then to Michaels, and the allegation was investigated by CPS. Michaels stated that she discussed this with Mother and Father and that Mother

23

"had a lot of difficulty making eye contact; very scattered.  She shifted the focus to a blaming of [K.R.G.] and said that she was making it up and lying about it."  Father was more appropriate in his reaction; although he did not want to believe it, "he did not blame [K.R.G.]."

When asked whether there was anything about the parents' behavior during the visits that concerned her, Michaels said that Mother's behavior "was really erratic, and very scattered; eyes were dilated and she couldn't sit still and focus, or concentrate, or stay on topic at all."  Michaels said that Father just seemed sad and that he did not interact much during that visit.

Michaels said that the other visit she observed was at the CPS office on January 2, 2012.  During that visit, K.R.G. was very distant and disinterested in the family and sat and watched Michaels during the entire session.  During most of the visit, Mother was on her phone; Mother also talked with Father and played with A.G.

Michaels testified that under K.R.G.'s particular circumstances,

Any caregiver who has a child with this diagnosis is going to have problems developing a relationship.  This is not something that will go away overnight.  She's going to need years of therapy to help her make up her reattachments with her caregivers, and be able to relate with caregivers and authority figures in her life.

She's going to need someone who has a lot of patience and tolerance, and can handle high levels of stress, because in her reactivity she is going to cause a lot of stress.

She's also going to need somebody who can apply very clearcut rules and guidelines, and follow through with consequences; that would work for her and are not going to set that

24

reactivity off; is going to be loving and kind, an emotionally present person.

Michaels testified that she thought termination of the parents' rights to K.R.G. and adoptive placement for K.R.G. would be in K.R.G.'s best interest because K.R.G. had been through so much change during her six-year life and was not fully attached to any one caregiver; she did not appear to be bonded to her parents, and she was slowly making real connections with the foster home that she was in. "[T]o remove her at this time would completely set back any progress that she has made." K.R.G. had told Michaels that she wanted to be adopted by her current foster family, with whom she had been living for several months by the time of the trial.

Dr. Laura Hastings testified that she performed two psychological evaluations on K.R.G., one in November 2010 and the other in December 2011. The first evaluation, when K.R.G. was almost five years old, was based in part on input from Debra. K.R.G.'s biggest fear at the time was that Debra would leave her or die, and K.R.G. had intense separation anxiety. Dr. Hastings described K.R.G.'s initial issues as:

> She had a lot of behavior issues that she would be intrusive and excessive efforts to seek attention.
>
> She had some anger issues; that means she had trouble tolerating limits that were set for her. She had some aggression towards others, including her grandmother. She continued to exhibit inappropriate behavior, despite interaction; meaning she would—she wasn't really learning from consequences.
>
> She would do those things when she was told not to.

25

Hyper activity, trouble sustaining attention, and feeling and worries about being moved from her grandmother's home.

Dr. Hastings initially diagnosed K.R.G. as "ADHD, adjustment disorder with a mixed disturbance of emotions and conduct, and rule out post-traumatic stress disorder." Debra had told Dr. Hastings that K.R.G. had been diagnosed with fetal alcohol syndrome, and Dr. Hastings noted that hyperactivity, attention-deficit, and lack of impulse control "can be complex and be hardwired, when there has been exposure to drugs or alcohol."

When asked about whether K.R.G. said anything about her visits with her parents, Dr. Hastings reported, "[K.R.G.] said she felt happy about seeing biological parents at visits. At the same time acknowledged she would not object to not seeing them if she was adopted by her foster parents."

Dr. Hastings performed additional testing in December 2011, including IQ testing, achievement testing, and personality testing, and she interviewed K.R.G. and her caregivers. She testified that her diagnostic impressions were ADHD-combined type, oppositional defiant disorder, and lower level intellectual functioning. Dr. Hastings said that as of the December 2011 testing, K.R.G. had been in a foster home for "little more than a month," so K.R.G. was under some stress. She noted that K.R.G. had persistent boundary issues and depression, which escalated K.R.G.'s aggression, based in part on Debra's death. Dr. Hastings recommended continuing therapy, intensive structure and stability,

26

psychiatric follow-ups, and close supervision because of K.R.G.'s aggression and poor judgment and to prevent her from harming herself.

Dr. Hastings opined that K.R.G. would need a lot of therapeutic intervention to help her participate in relationships with caregivers, "assuming that those caregivers are appropriate and attuned, and able to tolerate the ways in which—[s]he can do a lot of alienating behaviors." Dr. Hastings said that to parent K.R.G., the person would need to be emotionally and behaviorally stable and very tolerant "when it comes to the therapeutic guidance, because it would require, you know, guidance and feedback about how to understand [K.R.G.] and what she needs."

When asked what she thought might be the outcome for K.R.G. if she did not receive stable and mature care and instead returned to an unstable home situation, Dr. Hastings stated,

> Well, I think that her emotional behavior would—would escalate. I think it would interfere with functioning in all areas of her life, including at school.
>
> I think she would potentially become more aggressive, more difficult to manage, in terms of behavior; noncompliant, and more insecure, which, you know, would be, at this point—
>
> And if you look at the extremity of how insecure she was when she was four years old; at this time how bad—and that was extreme for four years old.
>
> . . . .
>
> She's—she's showing a tendency to kind of be indiscriminate and superficial in her attachments, and that's—that's pretty hard to turn around.

27

So I think, as is, you know, it's—it's going to be a challenge, and to experience more adversity and—

Especially when she at first has to change caregivers again, could cause serious damage in her capacity to have relationships with people.

Dr. Hastings indicated that K.R.G.'s caregiver should "absolutely" be drug-free and able to show a period of sobriety.

The trial court asked Dr. Hastings what Mother and Father would need to do if their rights to K.R.G. were not terminated, and Dr. Hastings responded,

Well, I think they would need to make sure they are stable. I think they would need to know how absolutely critical it would be to make [K.R.G.] the entire focus, for her to be a priority.

And how much reassurance she needs of—of her safety, and that her needs and her safety are the most important thing to her caregivers. And that the caregivers can guarantee that they can provide that for her.

They would need to know that she is going to do things that are very frustrating, and very alienating. And that they're going to need help knowing how to manage her, learning how; or maybe doing things differently than they're used to.

Learning—being open about it; being able to be taught how to interact with her, manage her behavior; and committing to, you know, just—it not being an option to make poor choices of—of their own.

The trial court asked Dr. Hastings what result poor parental choices could have on K.R.G., and Dr. Hastings replied that K.R.G. would "have a real hard time having relationships with anyone" throughout her life. Dr. Hastings stated that what would be best for K.R.G. is to have no more changes.

28

### c. Mother and Father's Home

Torres said that she told Mother and Father that A.G. could not come home with them because of CPS's concerns about their drug use, as well as the parents' lack of cooperation in allowing Torres to see the inside of their home. Torres described the outside of the home as in "pretty bad condition," with "a lot of clutter," and "lots of junk, and trash all around the home." Torres said that she could not get to the front door "because there was [sic] just boxes full of trash."

When Ferrugia visited Mother and Father's home, she described it as follows:

> The outside of the home was extremely cluttered; it was difficult to get to the staircase when we were inside the home.
>
> There was no place to sit down. She had laundry piled up on the couches. There were several—and by several, I mean, probably close to 10 or 12 televisions just all throughout the house; broken televisions in the house.
>
> The kitchen was probably the cleanest part of the house, but there was a—there were a lot of things on the floor, such as dog food, but their dog had recently passed away. And so I'm—I'm not sure how long that dog food had been laying out on the floor.
>
> Their bedroom was extremely cluttered and dirty. They were actually—There were actually sex toys scattered across the room. And there were—
>
> . . . .
>
> The bathroom was not cleaned at all. I couldn't even see the counter; there was just stuff all over the counter.
>
> The bedrooms that were for the children did not have any type of children's item[s] in—in the home, or in the bedrooms; it was

29

cluttered with motors and other various part[s] that [Father] uses for his employment.

Ferrugia acknowledged that after she discovered that Mother and Father had moved, she visited their new home, and they had cleaned up.

### d. CPS Service Plan

Ferrugia testified that she received the case at the end of July 2010. Ferrugia said that at the beginning of the case, she was unable to get in contact with Mother and Father; her first meeting with them took place in November 2010.

When Ferrugia met with Mother—Father was at work and unable to attend the meeting—she discussed the CPS service plan with Mother. Ferrugia described their conversation as follows:

> Initially, the appearance of the home was by far inappropriate for young children, so that was what we had discussed first and foremost.
>
> We also discussed with her giving an oral swab test. She was not able to produce—produce enough of saliva on a little swab that day, so I wasn't able to get a reading on her oral swab.
>
> We discussed the parenting classes. We discussed anger management. We discussed the counseling sessions, the psychological evaluation, and visits with the children.

Both parents agreed to perform the service plan. Ferrugia also asked them to do a drug assessment, which they eventually did; however, although she spoke with

Mother and Father in November 2010, she did not get their first drug and alcohol assessment until February 2011.[18]

Ferrugia testified that both Father and Mother completed their anger management class and parenting classes, as well as their psychological evaluations. However, although Ferrugia discussed the recommendations from their psychological evaluations with them, Mother and Father did not follow up with them. Mother always complied with Ferrugia's requests for drug tests but Father did not.[19] Ferrugia stated that the last drug test was at the end of May 2012, and the last hair follicle test was in December 2011.

Father testified that he had completed his parenting and anger management classes[20] required by his service plan, that he was able to maintain housing[21] and employment[22]—although he was unemployed at the time of the

---

[18]Ferrugia testified that Mother and Father would not submit to urinalysis for the first drug and alcohol assessment; she referred Mother for a second assessment at a different facility. Ferrugia said that she only sent Mother because she lost contact with Father after Mother moved out sometime before May 2011.

[19]Ferrugia said that she requested between ten and twelve hair follicle or oral swab drug tests over the course of the case.

[20]Father testified that he attended anger management classes to help him deal with his "anger outbursts," which were "mostly verbal."

[21]Father testified at the time of the termination trial that he would have been living with Micah and Mother if he had not been incarcerated pending the revocation hearing.

31

trial—and that he had completed his psychological evaluation. He did not recall when he completed his service plan. Father said that he had visited his children "once every two weeks for two hours," that he had missed two visits in 2012 due to incarceration, and that he believed he had made it to all of his visits in 2011. With regard to Father, Ferrugia said that when Mother moved in with her sister sometime before May 2011, Ferrugia lost contact with him and that he had stopped regularly visiting the children during that time.

The trial court admitted Father's certificates of completion of the Better Options "Step-Parenting Program," on March 10, 2011, and of the Better Options "Anger Management for Substance Abusers," on January 15, 2011 in Father's Exhibits 1 and 2, as well as Father's letter to Ferrugia requesting to continue individual and couples counseling, dated November 22, 2011.[23] Ferrugia said that, unlike with Mother, CPS never recommended that Father complete an intensive outpatient drug program, and she acknowledged that with regard to what he had been told to do as far as having the drug assessment, Father had complied.

With regard to her service plan, Mother said that although she did not have anger management issues, she attended the anger management workshop

[22]Father testified that prior to his incarceration, he had worked for the same employer for four years as a boat engine mechanic and had earned sufficient income to support him, Mother, and the children.

[23]Father said that he and Mother volunteered to do additional counseling classes because they "had learned so much" from their previous classes.

32

because her service plan required it. Mother also had a psychological evaluation. Mother testified that CPS did not ask her to maintain employment because she had always been a homemaker; however, because Father might be in jail for a year, she had started applying for jobs.

Mother stated that she had done everything that was required of her under her service plan, in addition to extra counseling sessions, but she acknowledged that although her plan required her to maintain housing, she had been unable to do that. She said that she and Father were closing on a house but that she would be living with Micah until they did so. She indicated that her plan to pay for the house was to complete an on-line course that she was enrolled in, describing her employment plan as, "what it boils down to is what I'll be doing is I'm being paid to be a mediator between websites and ad sites. And I'll be going in and posting ads on other people's websites and being paid to do so." Mother said that she would complete her training in two weeks, that she anticipated working at least twenty hours per week, and that it would pay enough to take care of herself and the children. Mother said that she had sufficient friends and family to help her care for the children and that Micah was willing to help her financially. Mother said that as soon as she could find P.A.P., she was getting a divorce.

Father testified that during the first year after A.G. was removed from him and Mother at the hospital, he and Mother had supervised visits with the children every week at Debra's house. However, Ferrugia said that she knew that Mother and Father had not been visiting the children during that time because she had

33

visited Debra's home monthly to ensure the children's safety and was in constant telephone contact with Debra.

Ferrugia testified that Mother and Father missed several visits with the children—one that they tried to reschedule, one due to car trouble, one due to oversleeping because their alarm clock did not go off, and the most recent one due to Father's incarceration. They would also contact Ferrugia at the last minute to cancel and showed up late to some of the visits that they tried to attend.

Ferrugia said that in the beginning, the missed visits had a negative effect on K.R.G. and she would have tantrums, but towards the end of the case, they did not have any effect on her. As an example, Ferrugia cited the last visit, which Father was unable to attend: "[K.R.G.] didn't even ask where he was." Ferrugia acknowledged that she had seen some visits in which K.R.G. appeared bonded with her parents. Nonetheless, in the two-hour visits that occurred every other week, Ferrugia said that most of the time, the parents were engaged in other things.

Sharon Word, who provided personal counseling for CPS clients at Better Options, began meeting with Mother and Father in August 2011 for individual and family counseling. They completed their twelve sessions in November 2011 and then received an additional three sessions as an extension, which ended in February 2012, based on Mother and Father's request. Word stated that her assignment was to work with them on their substance abuse, child neglect, and

34

poor parenting skills issues, as well as to work with Father on his anger management issues. Mother and Father told her that their children were in foster care because of substance abuse and neglect, but Word did not recall any specifics beyond that.

When asked about whether she believed Father's parenting skills were on par with what they should be, Word stated, "Well, maybe a little less than—than average awareness of things that could be done." Word said that Father seemed to grasp the concepts they discussed and did not seem resistant to making changes in order to raise his children properly.

Word said that Father had admitted to using drugs but that she believed that Mother and Father were "clean" at the time of their sessions with her, although she did not have access to their drug test results. Word clarified that Mother and Father had indicated to her when she first met with them that they had been clean for only a few months before August 2011.

Word testified that Mother's preliminary goals included to develop skills as a mother and housekeeper, because at that point Mother was a stay-at-home mother, and "there were some concerns about the condition of the household," as well as substance abuse issues, parenting skills, and "improving the situation for children in her home." She agreed that Mother initially appeared indifferent and immature in her behavior and that Mother initially minimized the importance of her substance abuse but that, as their sessions progressed, Mother passed the point of denial and began to take more responsibility. Word stated that

35

Mother repeatedly expressed her desire to have her children returned to her and completed all of her counseling sessions.

When asked whether she thought Mother would have the skills necessary to adequately care for her children if they were returned to her, Word stated, "I believe that the material was presented, and I felt like she was ready to use those skills." When asked what Mother and Father's primary problems were, Word replied, "Well, obviously their past substance abuse was an issue," as well as their communication problems based on the couple's different skills and ages.

The following dialogue occurred between Word and the children's ad litem counsel:

> Q. Okay. Now, did you discuss with [Mother], in particular, potential dangers to her children because of the use of methamphetamine?
>
> A. I did.
>
> Q. Was that part of your—of your regular counseling program?
>
> A. Yes.
>
> Q. Would you think it odd had she said she had never thought about the effects on—of any potential dangers to her children from the use of methamphetamine as a parent?
>
> A. It was probably not odd that people don't see the whole picture when they're using them.
>
> Q. So, if—if she still felt that way today, would you think that she had not gotten as much as she should have out of your counseling[?]
>
> A. I'd be surprised; yes.

36

Word said that Mother and Father did not mention having taken drug tests that had positive or false positive results during the same time that she was counseling them.

Father's attorney asked Word whether she thought that Mother and Father were capable of dealing with a child diagnosed with reactive attachment disorder, and Word replied, "I think they are." Word indicated that she felt like Father now had the information, skills, and commitment to care for his children in a better way, but she also admitted that she had never seen any interaction between the parents and their children and that her recommendation was based only on her interaction with Mother and Father. Word indicated that K.R.G.'s being moved from the foster home to her parents' home might be uncomfortable, with some acting out problems on K.R.G.'s part, but that it would not be "un-resolvable" if the parents were adequately educated on K.R.G.'s special needs, with an appropriate adjustment period.

Word acknowledged that she had not personally dealt with any children with reactive attachment disorder "except in terms of discussing with parents, or—you know, co-workers." She acknowledged that a therapist or psychologist who had been involved with the child would probably be more knowledgeable about what would be in the child's best interest as far as reuniting with her parents or staying in the foster home.

When asked why CPS recommended terminating Mother's parental rights, Ferrugia testified that Mother had not completed or complied with her court-ordered service plan—particularly intensive outpatient treatment—that CPS did not believe that she could parent the children, that Mother had no means to financially support the children with Father in jail, and that Mother had not maintained housing or employment and was currently residing with her father Micah, which CPS did not feel was a safe environment for the children. Ferrugia acknowledged that if Father had not been incarcerated, CPS would not have expected Mother to work as long as Father's income was sufficient to support the family. Ferrugia further testified that neither parent had maintained contact with CPS throughout the case, that they had not apprised her that Father was on probation, and that they had not informed CPS that they had moved in with Micah.

Ferrugia testified that Father's parental rights should be terminated because he had not obtained and maintained housing or employment and was currently incarcerated. Ferrugia acknowledged that Father had been employed prior to going to jail seventeen days before trial. Ferrugia testified that Mother and Father had had several address changes during the case and had failed to notify her and that there was a three-to-four-month period early in the case in which she had not been able to get into contact with Father.

With regard to endangerment, however, Ferrugia acknowledged that during the pendency of the case, Father had not placed K.R.G. with someone

38

who endangered her, although he had previously done so when Mother cared for K.R.G. prior to K.R.G.'s initial removal and placement with Debra. Ferrugia also acknowledged that Mother had not left K.R.G. with anyone who endangered her.

### e. Placement of the Children

Father stated that Mother and Micah would take care of the children while he was in jail. Father did not recall why the children had been removed from Micah's care and testified that Micah had visitation with the children every two weeks.[24]

---

[24]Father also testified that his sister Tina Rogers had said she was willing to take the children and that he did not believe Ferrugia when she told him that Tina had told her that she was not interested in taking them.

Ferrugia testified that Tina was "on the fence" about taking the children because she was concerned that the children did not really know her and that they might be better off where they were. After a home study on Tina's home, where Tina, Tina's husband, their adult daughter, and their two grandchildren lived, Ferrugia testified that CPS had concerns about Tina's husband's criminal history, which she said Tina and her husband denied having, and about proof of income, which Tina would not provide. Ferrugia said that at the beginning of March, Tina told Ferrugia that she just wanted to be the children's aunt and that she would like to see the foster parents adopt the children. Ferrugia testified that CPS did not recommend placing the children with Tina because of their concerns about her home study, because she had not had an ongoing relationship with the children, and because she had previously indicated that she did not want to be a placement for the children.

Tina acknowledged that she had previously told CPS that she was interested in being a placement for the children, stated that her feelings had not changed, and explained that there had been a miscommunication with CPS. With regard to her husband's criminal history, Tina said that her husband had been in a bar fight in 1999 but that during their thirteen years of marriage, there had been nothing else. During cross-examination, when asked about some assault charges and a DWI charge that CPS had found when it ran her husband's criminal history, Tina said that the first time she had heard of any of it

When asked whether, if the children were placed back with him and Mother, Father was willing and committed to making sure that K.R.G. received the treatment and therapy that she needed. Father replied, "A hundred and ten percent." When asked by DFPS's attorney how Father would do that if he was in jail, Father replied, "It's not set that I am actually going again," although he noted that it was a possibility. Father said that if he went to jail, he was sure Mother and his brother-in-law would make sure that K.R.G. would receive the care she needed. When asked, "So, in other words, you can't ensure that, because you'll be in jail, correct?" Father replied, "Correct." Father told the trial court that he still wanted his sister Tina to be considered as a placement for the children.

Mother testified that she and A.G. were bonded and she and K.R.G. were very close "until [CPS] picked up [her] children." Mother also testified that the children were bonded with her father Micah. Mother stated that Micah could help her with the children and that there was nothing about him that would cause any harm to the children. Mother testified that her understanding of why the children had been removed from Micah was "[b]ecause he could not care for them on his own."

When asked whether she was willing to do what it takes to care for K.R.G. with regard to K.R.G.'s special needs, Mother replied, "Without a doubt." On

was when they told her about it at the home study. Tina said that she did not have a criminal history but acknowledged that she had been arrested for a bad check in 2005; she said she had "gotten all that clear[ed] up."

40

cross-examination, when asked, with regard to K.R.G.'s needs and some of A.G.'s medical issues, whether Mother believed she had the skills to provide the children with everything they needed, Mother replied, "I believe I have the skills. I believe it will take, you know, a little bit of extra help, but I don't see a reason why I couldn't do it."

Ferrugia testified that the current foster family, with whom the children had been living for seven and a half months, was prepared to adopt the children and that the foster family had the skills and training to provide the children with what they needed. Ferrugia acknowledged that with regard to K.R.G.'s behavior, most of her behavioral problems started after Debra died.[25] However, she also noted that there was evidence that K.R.G. had had problems prior to Debra's death too.

Ferrugia described the changes she had seen in K.R.G. with regard to K.R.G.'s current foster family, stating,

> When I first met [K.R.G.], she was very scattered. She would jump from one subject to—to the next; that really grabs for attention.
>
> . . . .
>
> I—I would like to describe when she was living with her grandmother as an old sole [sic]. I mean, she would—she had words that were far beyond what a four and five year old's vocabulary should be; but yet her small words she didn't know.

---

[25]The first foster family requested that K.R.G. be removed because they could not handle her, and Ferrugia had received reports that K.R.G. had started acting out on A.G., covering his mouth and nose when he would cry and telling him to shut up.

Now, that she is with this placement, she—she appears to smile more. She doesn't have fits. She's not as scattered. She's more put together. She's more well rounded. She just appears to be a typical six-year-old girl. Now, unfortunately, she's still got some issues that she has to work through.

But through therapy she's learning how to cope with how she feels. How to understand her own feelings. There's just a huge change in that child; huge change.

Ferrugia said that it was a change for the better.

Marcia, K.R.G.'s and A.G.'s foster mother, testified that the children had been in her home since November 6, 2011, and that she and her husband planned to adopt them if the children became available for adoption. Marcia said that K.R.G. was seeing a psychiatrist once a month, an occupational therapist twice a week, and a play therapist once a week. The psychiatrist had prescribed a daily dose of Adderall for K.R.G. for her ADHD. K.R.G. was seeing an occupational therapist because her motor skills were delayed, and she was seeing a play therapist to help her learn how to interact with others and conduct herself properly. Marcia stated that K.R.G. had been very aggressive with A.G. and the foster family's ten-year-old adopted daughter but that this behavior had slowed quite a bit. Marcia also said that K.R.G. still constantly tells little lies and that she and her husband had talked with her about the consequences of lying.

Marcia said that A.G. had been sick a lot and had to have surgery to correct his nose problems; he had had tubes in his ears and had his adenoids removed. A.G.'s speech was delayed, but Marcia stated that every day, A.G. would say more and they could understand him better.

42

Marcia testified that the family's daughter considered K.R.G. to be her sister and A.G. to be her brother and that she could relate to and talk with K.R.G. about her prior foster experiences. Marcia said that K.R.G. only talked about her parents before and after a visit; she and K.R.G.'s teachers had noticed that K.R.G. would become withdrawn after a visit with them.

## C. Hearsay

In his second issue, Father complains that the trial court erred by admitting the hair follicle drug tests and their results "because the business records affidavits through which they were admitted did not meet the minimum requirements necessary to obviate their preclusion as hearsay." Likewise, in her first point, Mother argues that admitting the results of the hair follicle tests "from a laboratory in Ohio" was error.

At the conclusion of the trial on June 22, 2012, the trial court stated that it was going to "allow these tests and the hair follicles in" for the purposes cited in *In re K.C.P.*, 142 S.W.3d 574 (Tex. App.—Texarkana 2004, no pet.), before Mother and Father made their additional objections. After Mother and Father made their additional objections, however, the trial court stated, "Then I will not admit them conditionally upon everybody going through these specifically with this case," and gave Mother and Father until July 10, 2012, to file their objections to the "litigation packets."

Petitioner's Exhibit 6 contained records from both Omega Laboratories and Quest Diagnostics. The Omega documents reflect that hair was collected from

43

both Mother and Father on July 19, 2010. 1.0–1.5 inches of hair was collected from Father, corresponding to an "approximately 0–60, 90 day time frame," and 1.5 inches of hair was collected from Mother, corresponding to an "approximately 0–90 day time frame." With a confirmation cutoff in the screening for methamphetamine at 500 picograms per milligram (pg/mg) of hair, Father's test showed 1,942 pg/mg for amphetamine and 25,498 pg/mg for methamphetamine, while Mother's showed 1,691 pg/mg for amphetamine and 16,102 pg/mg for methamphetamine.

Other evidence already in the record, as set out above, showed that A.G. was born July 4, 2010, and that Father admitted at trial that he had used methamphetamine while Mother was pregnant with A.G. and said that he did not stop using drugs until after A.G.'s birth. Therefore, because the complained-of drug test evidence is cumulative of evidence already in the record that supported Father's drug use in and before July 2010, any error in the admission of this evidence was harmless, and we overrule Father's second issue. *See C.R.*, 263 S.W.3d at 370–71 (overruling appellant's complaint about the admission of her drug test results when there was extensive other evidence that appellant had used illegal drugs such that, even if the trial court considered the test results for the truth of the matter, they were cumulative, rendering the error, if any, harmless).

Further, while Mother denied at trial that she had used methamphetamine while pregnant with A.G., her responses to DFPS's requests for admission

44

contradicted this testimony.[26]  Mother also admitted that between the end of the first CPS case in 2008 and the beginning of the instant one in 2010, she had used illegal drugs, albeit "off and on, but not very often," and "[o]nce every couple of months," and that she had not used illegal drugs since A.G.'s birth. Furthermore, in her Star Council intake, Mother admitted that she had been given a urinalysis at the hospital on June 30, 2010, and a mouth swab by CPS on September 20, 2010, and that both tests were positive for methamphetamine. Therefore, the July 19, 2010 results for Mother were also cumulative evidence and harmless.[27]  *See id.*  We overrule Mother's first point.

## D. Endangerment

In his third issue, Father argues that K.R.G. was not in his possession during the case and that he had testified that he was unaware that Mother had been using drugs during her pregnancy with A.G.  He further argues that

---

[26]In their briefing on the sufficiency issues, both Mother and Father concede to having relapsed during the case.

[27]We note that in her appellate brief, Mother only challenges the documents from Omega Laboratories, Inc., which listed its address as 400 N. Cleveland Ave., Mogadore, Ohio, on its drug test report.  However, only Mother's July 19, 2010 sample was sent to Omega, and the portions of the record that Mother refers us to in her appellate brief actually pertain to Father's Omega records.  Mother made her objections at the conclusion of the trial, but she has not briefed the admissibility of her February 11, 2011 and December 12, 2011 tests that were sent to Quest Diagnostics, Inc., a lab in Kansas, and which showed a result of 19,450 pg/mg and 11,141 pg/mg for methamphetamine, respectively.  However, in light of her admissions that she had tested positive for illegal drugs in November 2011 and March 2011, covering approximately the same time periods, the effect of this evidence would also be cumulative even if it had been briefed.

45

because A.G. was removed at birth, his conduct could not have endangered the child.[28] In part of her second point, Mother also argues that she did not have possession of K.R.G. and claims that she and Father's temporary relapses were "always followed by months of sobriety" and did not affect the child.

## 1. Applicable Law

Both parents' rights were terminated under subsection (E) of family code section 161.001(1), the endangerment-by-conduct ground. *See* Tex. Fam. Code Ann. § 161.001(1)(E). Under subsection (E), the relevant inquiry is whether clear and convincing evidence exists to show that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being. *Id.* Termination under this ground must be based on more than a single act or omission; it requires a voluntary, deliberate, and conscious course of conduct. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). However, it is not necessary

---

[28]Father admits that "it is undisputed" that he and Mother led an unstable life prior to DFPS's current involvement with them, that "[t]heir household was unkempt and potentially dangerous to the children," and that they "had involvement with controlled substances and criminal convictions." Nonetheless, he contends that after DFPS removed K.R.G. and A.G., he and Mother "cleaned up their act," and that when they relapsed into drug use, "those instances never affected the children," who were in foster care. In part of her second point, Mother concurs with Father's assessment that prior to DFPS's intervention, they "lived in undesirable living conditions, had involvement with drugs and criminal convictions," but that DFPS's intervention led to "numerous positive improvements" and that their relapses did not affect the children. These arguments, however, appear to have more to do with the trial court's best interest finding—which we address below—than its endangerment finding.

46

that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125.

Further, we may look at parental conduct both before and after the child's birth to determine whether termination is necessary. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re E.A.W.S.*, No. 02-06-00031-CV, 2006 WL 3525367, at *10–11 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.) (stating that mother who took drug overdose while thirty-nine weeks' pregnant endangered unborn child's physical well-being); *see also In re U.P.*, 105 S.W.3d 222, 234 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g) ("Endangerment may include evidence of drug addiction and its effect on a parent's life and his ability to parent. Endangerment can also include knowledge that a child's mother abused drugs." (citations omitted)). Evidence of how a parent has treated another child is relevant to whether a course of conduct has been established under subsection (E). *See D.T.*, 34 S.W.3d at 637. And while mere imprisonment will not, standing alone, constitute endangering conduct under subsection (E), "if the evidence, including imprisonment, shows a course of conduct that has the effect of endangering the physical or emotional well-being of the children, a finding of endangerment is supportable." *In re C.D.E.*, No 02-12-00021, 2012 WL 6632800, at *1, *5–6 (Tex. App.—Fort Worth Dec. 21, 2012, no pet.) (reversing termination order when there was no evidence that Mother had

47

had a drug problem when Father was incarcerated nine years before the termination trial and Father had been incarcerated since then).

### 2. Analysis

In her responses to DFPS's requests for admissions in which she admitted that she had used drugs while pregnant with A.G., and in her testimony that she had never thought about whether it might be harmful to her children for her to use drugs, Mother provided the trial court with evidence of a continuation of the same endangering course of conduct that she had previously engaged in when she used methamphetamine at home prior to K.R.G.'s original removal in 2007. Reviewed in the light most favorable to the endangerment finding and the judgment, and deferring to the trial court's credibility determinations, the trial court could have reasonably concluded that Mother's continuing course of conduct, despite K.R.G.'s earlier removal and A.G.'s removal from her at birth, endangered K.R.G.'s physical and emotional well-being, particularly in light of the testimony by Shelby Michaels, about how drug users "cannot be emotionally there for their child." *See J.P.B.*, 180 S.W.3d at 573. Therefore, we conclude that the evidence is legally sufficient to support the trial court's endangerment finding with regard to Mother, and we overrule this portion of Mother's second point.

Likewise, giving due deference to the trial court's finding, on the entire record—and despite Mother's testimony that she had not used drugs while pregnant with A.G.—we conclude that the trial court could have reasonably

48

formed the same firm conviction or belief that Mother had engaged in endangering conduct. *See H.R.M.*, 209 S.W.3d at 108. Therefore, we conclude that the evidence is also factually sufficient to support the trial court's endangerment finding with regard to Mother, and we overrule this portion of Mother's second point.

Further, reviewed in the light most favorable to the endangerment finding, although Father claimed at trial that he did not know Mother was using drugs while pregnant with A.G., Mother admitted that he knew, and their prior pattern of using methamphetamine together—as well as Father's admission that a third person had been living with them and using drugs in their presence while Mother was pregnant with A.G.—gave the trial court sufficient evidence to conclude that Father had also engaged in the same endangering course of conduct in 2010 as had led to K.R.G.'s removal in 2007. *See J.P.B.*, 180 S.W.3d at 573. Therefore, we conclude that the evidence is legally sufficient to support the trial court's endangerment finding as to Father, and we overrule this portion of his third issue.

And, giving due deference to the trial court's finding, on the entire record—despite Father's argument that he could not have endangered K.R.G. because she was never in his possession—we conclude that the trial court could have reasonably formed the same firm conviction or belief that Father had engaged in endangering conduct, particularly in light of his potential post-trial termination incarceration. *See H.R.M.*, 209 S.W.3d at 108. Therefore, we conclude that the evidence is also factually sufficient to support the trial court's endangerment

49

finding with regard to Father, and we overrule the remainder of Father's third issue.

## E. Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Factors to consider in evaluating the parent's willingness and ability to provide the child with a safe environment include the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of the harm to the child; the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b).

Further, we should consider whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with, among other things, care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; guidance and supervision consistent with the child's safety; a safe physical home environment; protection from repeated exposure to violence even though the violence may not be directed at the child; and an understanding of the child's needs and capabilities. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

51

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Father argues that insufficient evidence was introduced that he would not be able to adequately provide for K.R.G.'s emotional, physical, mental, or spiritual needs now or in the future or that he would present an emotional or physical danger to K.R.G. now or in the future. He contends that "[t]he commitment of the parents to acquire special education and training into the needs of their children clearly controvert any possible danger to the children in the future." Mother makes essentially the same arguments, adding that both parents had "participated in all services required of [sic] by the Department and by the Court," and that, based on "the entire record as a whole, and recognizing the positive changes and commitments exhibited by [Mother] and [Father], a reasonable fact finder could not form a firm conviction or belief" that termination of her parental rights was in K.R.G.'s best interest. We disagree.

First, during the pendency of the second CPS case brought with regard to their parental rights to K.R.G., the record reflects that both parents failed to maintain contact with CPS and to remain drug-free, or to engage K.R.G. at the visits they attended, demonstrating their lack of willingness and ability to provide

52

K.R.G. with a safe environment, particularly in light of the child's mental vulnerabilities. *See* Tex. Fam. Code Ann. § 263.307(b). Mother denied that K.R.G. had had any developmental problems before her removal, which was contradicted by the other evidence at trial provided by more than one of the other witnesses who had interacted with the child. Both children were removed from Micah based on his assaultive conduct; Mother's response to K.R.G.'s outcry and both parents' plan for the children to be cared for by Micah if the children were returned could have reinforced finding that both parents lacked the will and ability to provide K.R.G. with a safe environment. *See id.* Father admitted that he could not ensure that Mother would make sure K.R.G. received the treatment and therapy she needed if he was in jail. *See id.*

While both parents successfully completed their counseling services, the record reflects that they were less than cooperative with regard to facilitating CPS's supervision, and the trial court could have found that their ability to effect positive environmental and personal changes—particularly in light of the descriptions of the various visits with the children that the parents attended—was not enough to support a best interest finding in either parent's favor. *See id.*

Michaels testified that she thought termination of the parents' rights to K.R.G. and adoptive placement for K.R.G. would be in K.R.G.'s best interest in light of K.R.G.'s reactive attachment disorder, because "to remove her at this time would completely set back any progress that she has made." Further, Michaels testified that K.R.G. had told her that she wanted to be adopted by her

53

current foster family. Marcia, K.R.G.'s foster mother, testified that she planned to adopt K.R.G. and A.G. if the children became available for adoption. The children had lived with her for over seven months by the time of trial. Ferrugia testified that the foster family had the skills and training to provide K.R.G. and A.G. with what they needed and described the positive changes she had seen in K.R.G. during the time that K.R.G. had lived with Marcia.

Viewed in the light most favorable to the best interest finding and the judgment, we conclude that the trial court could have formed a firm belief or conviction that termination of Mother's and Father's parental rights would be in K.R.G.'s best interest. *See J.P.B.*, 180 S.W.3d at 573. Likewise, on the entire record, the disputed evidence contrary to the finding is not so significant that the trial court could not have reasonably formed a firm belief or conviction in the truth of its finding. *See H.R.M.*, 209 S.W.3d at 108. Therefore, because the evidence is legally and factually sufficient to support the trial court's best interest finding, we overrule Father's fourth issue and the remainder of Mother's second point.

## IV.  Conclusion

Having overruled Mother's and Father's dispositive issues, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY and GABRIEL, JJ.

DELIVERED:  March 21, 2013